58 F.3d 814
 Theodore BAKER, Raymond Strawder, Yohannes Jackson, Mark A.
Simon and Malcolm Nelson, Plaintiffs,
Milton Goodman, Anthony Canady, Tyrone Sanchez and Richard
Jackson, Plaintiffs-Appellants,
v.
Mario CUOMO, Governor of the State of New York, Thomas A.
Coughlin, Commissioner of New York State
Department of Correctional Services,
Defendants-Appellees.
 Nos. 565, 1135, 1136, 1137, Docket 94-2163 to 94-2165 and 94-2176.
 United States Court of Appeals, Second Circuit.
 Argued Dec. 15, 1994.
Decided May 12, 1995.
Opinion Denying Rehearing
June 19, 1995.
 
 Andrew L. Shapiro, New Haven, CT, Yale Law School, (Brett Dignam, New Haven, CT, The Jerome N. Frank Legal Services Organization, of counsel, on the brief), for plaintiffs-appellants.
 Laura M. Nath, New York City, Asst. Atty. Gen. (G. Oliver Koppell, Atty. Gen., Frederic L. Lieberman, Asst. Atty. Gen., of counsel, Patrick M. McGuirk, Student Intern), for defendants-appellees.
 Before: NEWMAN, Chief Judge, FEINBERG and MESKILL, Circuit Judges.
 FEINBERG, Circuit Judge:
 Plaintiffs-appellants are black and hispanic convicted felons held in a New York State prison. As incarcerated felons, they are denied the right to vote under Sec. 5-106 of New York State's Election Law (Sec. 5-106) even though other felons, who are not incarcerated, may exercise that right. Plaintiffs challenged their disenfranchisement by filing pro se complaints in the United States District Court for the Southern District of New York alleging civil rights violations by defendants, then-Governor of New York State Mario Cuomo and Commissioner of New York State Department of Correctional Services Thomas A. Coughlin. In particular, plaintiffs claimed that because of the racial composition of the state prison population and because of racially discriminatory sentencing in the state criminal justice system, defendants' enforcement of Sec. 5-106 violated Sec. 2 of the Voting Rights Act as well as the Fourteenth and Fifteenth Amendments of the United States Constitution.
 The district court, Vincent L. Broderick, J., dismissed plaintiffs' complaints sua sponte pursuant to Fed.R.Civ.P. 12(b)(6). We reverse and remand for further proceedings.
 
 I. Background
 
 1
 In September 1993, nine black and hispanic New York State prisoners, proceeding in forma pauperis and invoking 42 U.S.C. Sec. 1983, filed substantially identical pro se complaints in the district court, on behalf of themselves and all individuals similarly situated, alleging violations of their federal civil rights. In particular, they alleged that defendants deprived them of their right to vote by enforcing Sec. 5-106. That section provides, in relevant part:
 
 
 2
 Qualifications of voters; reasons for exclusion
 
 
 3
 * * * * * *
 
 
 4
 2. No person who has been convicted of a felony pursuant to the laws of this state, shall have the right to register for or vote at any election unless he shall have been pardoned or restored to the rights of citizenship by the governor, or his maximum sentence of imprisonment has expired, or he has been discharged from parole. The governor, however, may attach as a condition to any such pardon a provision that any such person shall not have the right of suffrage until it shall have been separately restored to him.
 
 
 5
 3. No person who has been convicted in a federal court, of a felony, or a crime or offense which would constitute a felony under the laws of this state, shall have the right to register for or vote at any election unless he shall have been pardoned or restored to the rights of citizenship by the president of the United States, or his maximum sentence of imprisonment has expired, or he has been discharged from parole.
 
 
 6
 4. No person who has been convicted in another state for a crime or offense which would constitute a felony under the laws of this state shall have the right to register for or vote at any election in this state unless he shall have been pardoned or restored to the rights of citizenship by the governor or other appropriate authority of such other state, or his maximum sentence has expired, or he has been discharged from parole.
 
 
 7
 5. The provisions of subdivisions two, three and four of this section shall not apply if the person so convicted is not sentenced to either death or imprisonment, or if the execution of a sentence of imprisonment is suspended.
 
 
 8
 * * * * * *
 
 
 9
 N.Y.Elec.Law Sec. 5-106 (McKinney) (emphasis supplied).
 
 
 10
 Each plaintiff further alleged that blacks and hispanics comprise a disproportionately high percentage of the New York State prison population and that defendants' enforcement of Sec. 5-106 "deprives plaintiff of his right to vote and promotes racial discrimination in voting practices ... [without a] compelling [state] interest."
 
 
 11
 Each plaintiff sought declaratory and injunctive relief, primarily requesting that the district court direct defendants "Cuomo and Coughlin to ensure and enable plaintiff and those similarly situated to vote in the November, 1993 New York City elections, and all future elections until a ruling is enter[ed] in this pending action[ ]." They also sought "nominal damages" of $1.50 per day if defendants did not enable them to vote.
 
 
 12
 Defendants never answered these complaints. While they were preparing to respond, the district court suggested that they instead await the outcome of the court's sua sponte action. Thereafter, in a memorandum opinion dated December 1993, the district court sua sponte consolidated the nine complaints and notified plaintiffs that unless they responded "to the considerations outlined" in its opinion, it would dismiss the claims under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. Baker v. Cuomo, 842 F.Supp. 718, 723 (S.D.N.Y.1993).
 
 
 13
 The district court's thoughtful memorandum opinion stated that this case "raises profound issues." Id. at 720. The court identified a number of potential legal bases for plaintiffs' claims, including violation of the Voting Rights Act and violation of the equal protection component of the Fourteenth Amendment. The court did not mention the Fifteenth Amendment as a possible ground of recovery. In justifying dismissal, the court stated that the issues raised had been "examined by the judiciary with uniform negative outcomes," id. at 720, and added that "awaiting responses by the defendants would consume resources with little likelihood of benefit to plaintiffs." Id. However, the opinion invited this court to take a different view, noting that an appellate court might choose to grant the relief sought in light of "the importance of voting rights and the weakness of contrary imperatives." Id. at 721. The court then considered the specific causes of action it had identified.
 
 
 14
 Regarding the equal protection claim, the court stated, "Voting is a fundamental political right[.] Disenfranchisement of felons under state law, however, has been consistently upheld." Id. (citations omitted). The court went on to note that both the "Equal Protection Clause and the federal Voting Rights Act" protect "members of minority communities." But, the court pointed out, "political empowerment of those convicted of crime [might] ... depriv[e] innocent citizens of the opportunity to guide the destiny of their municipalities or obtain representation at the county or state level." Id. at 720-21 (footnote omitted). In addressing the alleged Voting Rights Act violation, the court stated, "Disproportionate racial impact of felon disenfranchisement on a minority voting population does not establish a violation of the Voting Rights Act absent other reasons to find discrimination." Id. at 722.
 
 
 15
 The court gave plaintiffs 45 days to respond to its concerns and tolled defendants' time to move or answer pending the outcome of its sua sponte determination. The district court also denied a request by plaintiffs for appointment of counsel. Id. at 723. Finally, the court declined to consider class certification because "all complaints will be dismissed unless cause to the contrary can be shown." Id. at 720 n. 1.
 
 
 16
 In February 1994, four of the original plaintiffs, Milton Goodman, Richard Jackson, Tyrone Sanchez and Raymond Strawder, filed pro se amended complaints and supporting memoranda in response to the district court's order. These complaints were also substantially identical, although more detailed than the original complaints. The amended complaints clarified the bases of plaintiffs' claims for relief under Sec. 1983 for violations of the Voting Rights Act, the Fourteenth Amendment and the Fifteenth Amendment.
 
 
 17
 The relevant factual contentions raised in the amended complaints were as follows:
 
 
 18
 10) Upon information and belief, Blacks and Latinos combined comprise approximately 22 percent of New York State's population.
 
 
 19
 11) Upon information and belief, Blacks and Latinos comprise 82 percent of New York State's prison population.
 
 
 20
 12) Upon information and belief, approximately 75 percent of New York State's prison population consists of persons from [14 state] assembly districts ..., which are located in New York City.
 
 
 21
 13) In 1988, New York State's Chief Judge ... commissioned a committee titled The New York State Judicial Commission On Minorities ... to study the presence and effects of racism in the state's courts.
 
 
 22
 14) In April 1991, the [Commission] reported [in a "Report on Minorities"] that there was evidence of race-based disparity in the State Courts' conviction rate and sentence type....
 
 
 23
 * * * * * *
 
 
 24
 21) Prior to the September 1993, New York City Primary, plaintiff informed defendant Cuomo that N.Y.Election law Sec. 5-106(5) violated the equal protection clause of the Federal and State Constitutions, and requested that Cuomo take action to ensure plaintiff's right to vote in the upcoming City-wide Primary and Election.
 
 
 25
 22) In response to plaintiff['s] request, defendant Cuomo referred plaintiff's request to defendant Coughlin for disposition.
 
 
 26
 23) ... Coughlin issued memoranda indicating that the law denying plaintiff the right to vote was constitutional and will be enforced as always....
 
 
 27
 According to the Report on Minorities cited in the amended complaints, blacks and hispanics are more likely than whites to be imprisoned for commission of the same felony offense in New York State. See 2 Report of the New York State Judicial Commission on Minorities: The Public and the Courts 162-76 (1991). The Report on Minorities made an explicit finding that "[t]here is a perception, supported in several aspects by research findings, that there is a race-based disparity in the conviction rate and the sentence type." Id. at 176.
 
 
 28
 In a February 1994 order, without elaboration, the district court dismissed plaintiffs' complaints sua sponte. Four of the original plaintiffs, Anthony Canady, as well as Goodman, Jackson and Sanchez, thereafter filed this appeal. As noted above, Goodman, Jackson and Sanchez had all filed amended complaints. Canady had not. Raymond Strawder, who filed an amended complaint, did not file a notice of appeal. In this court, defendants claim that they were never served with Jackson's complaint, and they have neither waived service of process nor defended the action as to him. Plaintiffs are represented by pro bono counsel on this appeal.
 
 II. Discussion
 A. Sua Sponte Rule 12(b)(6) Dismissal
 
 29
 We have previously stated that sua sponte dismissals without service of process and filing of a response by the opposing party are disfavored. See Bayron v. Trudeau, 702 F.2d 43, 45 (2d Cir.1983); Moorish Science Temple of America, Inc. v. Smith, 693 F.2d 987, 990 (2d Cir.1982). Rule 12(b)(6) dismissal is appropriate only where "it appears beyond doubt that ... no set of facts" would permit recovery on the plaintiff's claims. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957). Further, the court must liberally construe the pro se complaint, Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972), and the allegations therein "should be construed favorably to the pleader." Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). A complaint should not be dismissed simply because a plaintiff is unlikely to succeed on the merits. Id. Rule 12(b)(6) dismissals are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development. Wright & Miller, 5A Federal Practice and Procedure: Civil 2d Sec. 1357 at 341-43 (1990 & 1994 pocket part).
 
 
 30
 We do not suggest, however, that sua sponte dismissal is never appropriate. It is a useful device for disposing of frivolous or malicious in forma pauperis filings, see 28 U.S.C. Sec. 1915(d); Perez v. Ortiz, 849 F.2d 793, 797 (2d Cir.1988), or frivolous habeas corpus petitions. Id. It is also appropriate if it appears from the face of the complaint that the action is barred, for example by expiration of the statute of limitations. See Pino v. Ryan, 49 F.3d 51, 53-54 (2d Cir.1995); Leonhard v. United States, 633 F.2d 599, 609 n. 11 (2nd Cir.1980), cert. denied, 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981). In Pino, we pointed out that although "we have frequently urged district judges to use caution in deciding whether to dismiss [pro se] complaints [pursuant to Sec. 1915(d) ] prior to service upon defendants and the filing of a motion or answer ... caution need not lead to paralysis." Pino, 49 F.3d at 53.
 
 
 31
 Strictly speaking, this case is not governed by Pino, since the judge here apparently dismissed under Rule 12(b)(6) rather than Sec. 1915(d). Nevertheless, a bit more caution would have been proper here. The complaints are not clearly precluded by a bar such as a statute of limitations. Nor are they facially frivolous or malicious. Moreover, the state attorney general's office, which represents defendants in this matter, acknowledged at oral argument before us that there is an absence of clear authority on the Voting Rights Act issues. Certainly with respect to that claim, it appears that this case raises novel and important legal issues that require more thorough consideration than a sua sponte dismissal pursuant to Rule 12(b)(6) filed without any response from defendants allows. Whatever we may think of appellants' chances of success on the merits, it is clearly not beyond doubt that recovery on the statutory claim would be precluded under any set of facts. Accordingly, we reverse the order of dismissal and remand this case to the district court. On remand, it would be appropriate to appoint counsel, as plaintiffs requested in the district court, to represent plaintiffs. We assume that pro bono counsel on appeal, The Jerome N. Frank Legal Services Organization, which has done an excellent job in this court, would be the logical candidate for such appointment. Because plaintiffs were without counsel in the district court and because further proceedings will be necessary, we believe it appropriate to offer some guidance to the district court.
 
 B. Proceedings on Remand
 
 32
 All three of plaintiffs' causes of action in the amended complaints were premised on allegations that by enforcing Sec. 5-106, defendants had deprived plaintiffs of their federal rights in violation of 42 U.S.C. Sec. 1983.
 
 
 33
 By the plain terms of Sec. 1983, two--and only two--allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law.
 
 
 34
 Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). Defendants do not dispute that they were acting in their capacity as state officials by enforcing the incarcerated felon disenfranchisement statute, Sec. 5-106. Therefore, the principal question is whether enforcement of that statute deprived plaintiffs of federal rights secured by the Fourteenth or Fifteenth Amendments or by the Voting Rights Act.
 
 
 35
 (1) Fourteenth Amendment Equal Protection Claim
 
 
 36
 The district court dismissed plaintiffs' claim that defendants violated the Equal Protection Clause apparently because it found that "[d]isenfranchisement of felons under state law ... has been consistently upheld." Baker, 842 F.Supp. at 721 (citations omitted). The district court also cited Sec. 2 of the Fourteenth Amendment, signalling the court's apparent conclusion that the framers of the Fourteenth Amendment recognized and implicitly accepted the contemporaneous state practice of disenfranchising citizens for participation in certain crimes. See Richardson v. Ramirez, 418 U.S. 24, 43, 94 S.Ct. 2655, 2665-66, 41 L.Ed.2d 551 (1974).
 
 
 37
 On appeal, plaintiffs argue that Sec. 5-106 should be subject to strict scrutiny because it deprives them of their fundamental right to vote and because they alleged intentional race discrimination. They maintain that dismissal was inappropriate because defendants never offered a compelling state interest to justify the statute. In addition, plaintiffs claim that the district court failed to liberally construe their amended complaints as raising a minimum rationality challenge to the classification as well.
 
 
 38
 (a) Appropriate level of scrutiny
 
 
 39
 In reviewing the constitutionality of a statute that deprives a subclass of felons of the right to vote but permits other felons to retain the franchise, a key preliminary issue is the appropriate level of equal protection scrutiny to be applied. This issue has been fully briefed in this court by counsel for both parties.
 
 
 40
 Although the right to vote is generally considered fundamental, in the absence of any allegation that a challenged classification was intended to discriminate on the basis of race or other suspect criteria, statutes that deny felons the right to vote are not subject to strict judicial scrutiny. Ramirez, 418 U.S. at 54-56, 94 S.Ct. at 2670-2672; Owens v. Barnes, 711 F.2d 25, 27 (3d Cir.), cert. denied, 464 U.S. 963, 104 S.Ct. 400, 78 L.Ed.2d 341 (1983); Shepherd v. Trevino, 575 F.2d 1110, 1114-15 (5th Cir.1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979); see also Wesley v. Collins, 791 F.2d 1255, 1261 (6th Cir.1986); cf. Hunter v. Underwood, 471 U.S. 222, 232-33, 105 S.Ct. 1916, 1922-23, 85 L.Ed.2d 222 (1985); Hobson v. Pow, 434 F.Supp. 362, 366 (N.D.Ala.1977).
 
 
 41
 In Ramirez, the Supreme Court upheld California constitutional and statutory provisions that permanently disenfranchised all convicted felons (including those who had completed their sentences) unless the felon's right to vote had been restored by court order or executive pardon. The Court relied on Sec. 2 of the Fourteenth Amendment. That provision states that the number of representatives allocated to each state "shall be reduced" if that state "denie[s] ... or in any way abridge[s], ... except for participation in rebellion, or other crime " the right of "male inhabitants of such State, being twenty-one years of age, and citizens of the United States" to vote in certain elections. U.S. Const. amend. XIV, Sec. 2 (emphasis supplied). After examining the congressional debates leading to the passage of this provision and considering other evidence regarding the original understanding of the Framers, the Court noted that "the exclusion of felons from the vote has an affirmative sanction in Sec. 2 of the Fourteenth Amendment." 418 U.S. at 54, 94 S.Ct. at 2671. The Court then concluded that Sec. 1 of the Fourteenth Amendment "could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the less drastic sanction of reduced representation which Sec. 2 imposed for other forms of disenfranchisement." Id. at 55, 94 S.Ct. at 2671. The Court therefore did not inquire into whether California had a " 'compelling state interest' to justify exclusion of ex-felons from the franchise." Id. at 54, 94 S.Ct. at 2671.
 
 
 42
 In Owens, the Third Circuit relied on Ramirez in upholding a Pennsylvania statute that, like the New York statute challenged in this case, disenfranchised incarcerated felons while permitting unincarcerated felons to vote. 711 F.2d at 26. The court held that because "the right of convicted felons to vote is not 'fundamental,' " the statute would not violate the Equal Protection Clause unless it were irrational, which it was not. Id. at 27-28; see also Shepherd, 575 F.2d at 1114-15.
 
 
 43
 We agree with the Third Circuit that the similar classification before us in Sec. 5-106 is not irrational. Owens held the statute in that case constitutional despite "the state's inexplicable failure to provide in its brief any rationale for such distinction." 711 F.2d at 27. The court found that the statute was rationally related to policies underlying the penal system and upheld the district court's Rule 12(b)(6) dismissal of the claim. Id. at 28 (citations omitted). In commenting on this possible state interest, the court further observed:
 
 
 44
 The state could rationally decide that one of the losses, in addition to the basic deprivation of liberty, to which a prisoner who is incarcerated should be subject is that of participation in the democratic process which governs those who are at liberty. At the same time, Pennsylvania could rationally determine that those convicted felons who had served their debt to society and had been released from prison or whose crimes were not serious enough to warrant incarceration in the first instance stand on a different footing from those felons who required incarceration, and should therefore be entitled to participate in the voting process.
 
 
 45
 Id.
 
 
 46
 This court has also ruled that felon disenfranchisement is reasonably related to social contract principles, penal considerations and the state's interest in ensuring that elections are free from fraud and corruption. See Green v. Board of Elections, 380 F.2d 445 (2d Cir.1967) (Friendly, J.), cert. denied, 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968).
 
 
 47
 The early exclusion of felons from the franchise by many states could well have rested on Locke's concept, so influential at the time, that by entering into society every man "authorizes the society, or which is all one, the legislature thereof, to make laws for him as the public good of the society shall require, to the execution whereof his own assistance (as to his own decrees) is due." A man who breaks the laws he has authorized his agent to make for his own governance could fairly have been thought to have abandoned the right to participate in further administering the compact. On a less theoretical plane, it can scarcely be deemed unreasonable for a state to decide that perpetrators of serious crimes shall not take part in electing the legislators who make the laws, the executives who enforce these, the prosecutors who must try them for further violations, or the judges who are to consider their cases. This is especially so when account is taken of the heavy incidence of recidivism and the prevalence of organized crime. A contention that the equal protection clause requires New York to allow convicted mafiosi to vote for district attorneys or judges would not only be without merit but as obviously so as anything can be.
 
 
 48
 Id. at 451-52 (footnote and citation omitted). Although the statute at issue in Green did not distinguish, as Sec. 5-106 does, between incarcerated and unincarcerated felons, the state has argued that the same justifications support the instant classification. Having held that these justifications are sufficiently related to disenfranchisement of felons generally, we cannot say that they are not reasonably related to disenfranchisement of those felons who commit crimes serious enough to warrant incarceration.
 
 
 49
 Plaintiffs rely on two principal cases, Hunter v. Underwood and Hobson v. Pow, both cited above, which invalidated state laws disenfranchising certain classes of felons, as support for their argument that strict scrutiny applies. However, these cases are distinguishable from this one. Hunter addressed a section of the Alabama state constitution that intentionally discriminated against blacks. 471 U.S. at 229-32, 105 S.Ct. at 1920-22. Hobson invalidated a different subsection of the same state constitutional provision, which disenfranchised "wife-beaters." 434 F.Supp. at 365. Such provisions were intended to prevent newly-enfranchised former slaves from voting. See Andrew L. Shapiro, Challenging Criminal Disenfranchisement Under the Voting Rights Act: A New Strategy, 103 Yale L.J. 537, 541-42 (1993).[1] Moreover, the Hobson court found an independent basis for heightened scrutiny in the suspect gender classification on the face of the provision. Hobson, 434 F.Supp. at 365-67. In contrast, Sec. 5-106 displays no suspect classification on its face.
 
 
 50
 Plaintiffs also claim that heightened scrutiny is justified because Sec. 5-106 has a discriminatory purpose. Plaintiffs argue on appeal that their amended complaints did allege such a purpose, but we can discern no such allegation. Disparate impact alone is not sufficient to establish a Fourteenth Amendment violation. Hunter, 471 U.S. at 227-28, 105 S.Ct. at 1919-20. Since plaintiffs were without the benefit of counsel in the district court, they should not be precluded in the proceedings on remand from seeking to amend their complaints to include an adequately pleaded allegation of intentional discrimination.[2] We express no view on whether such an amendment would be justified or could be proved based upon the legislative history of the New York statute. See, e.g., 1909 N.Y.Laws ch. 22, Sec. 175; 1949 N.Y.Laws ch. 100, Sec. 152(2); 1971 N.Y.Laws ch. 310, Sec. 1; 1973 N.Y.Laws ch. 679, Sec. 1.
 
 
 51
 (2) Fifteenth Amendment
 
 
 52
 As with plaintiffs' Fourteenth Amendment claim, we are unable to find any claim of intentional discrimination "on account of race, color, or previous condition of servitude," to support appellants' Fifteenth Amendment claim. U.S. Const. amend. XV, Sec. 1; see also City of Mobile v. Bolden, 446 U.S. 55, 62, 100 S.Ct. 1490, 1497, 64 L.Ed.2d 47 (1980); Butts v. City of New York, 779 F.2d 141, 143-45 & n. 1 (2d Cir.1985), cert. denied, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986). The theory upon which plaintiffs seek relief is that defendants' enforcement of Sec. 5-106 resulted in vote denial or vote dilution on account of race. However, as with their Fourteenth Amendment claim, appellants should not be precluded from seeking to amend their complaint to adequately allege intentional discrimination on remand.
 
 
 53
 (3) Voting Rights Act
 
 
 54
 The Voting Rights Act, as amended in 1982, Pub.L. No. 89-110, 79 Stat. 437 (the Act) (codified as amended at 42 U.S.C. Sec. 1973 et seq.), does not require a showing of intent in order to establish a violation. See S.Rep. No. 417, 97th Cong., 2d Sess. 28 (1982), reprinted in 1982 U.S.C.C.A.N. (vol. 2) 177, 205-06 (Senate Report accompanying the 1982 amendments) ("[T]he specific intent of this amendment is that the plaintiffs may choose to establish discriminatory results without proving any kind of discriminatory purpose." (footnote omitted)). The 1982 amendments explicitly adopted a results-oriented test and a "totality of the circumstances" standard. Section 2 of the Act as amended provides, in relevant part,
 
 
 55
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State ... in a manner which results in a denial or abridgement of the right ... to vote on account of race or color, or [membership in language minority group protected by the Act].
 
 
 56
 (b) A violation ... is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State ... are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.
 
 
 57
 * * * * * *
 
 
 58
 42 U.S.C. Sec. 1973 as amended (emphasis added).
 
 
 59
 The Senate Report accompanying the 1982 amendments listed nine non-exclusive factors that may be considered in determining whether, under the totality of the circumstances, a scheme or practice results in a violation of the Act. These include but are not limited to:
 
 
 60
 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
 
 
 61
 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
 
 
 62
 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
 
 
 63
 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
 
 
 64
 6. whether political campaigns have been characterized by overt or subtle racial appeals;
 
 
 65
 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.
 
 
 66
 Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:
 
 
 67
 whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.
 
 
 68
 whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.
 
 
 69
 Senate Report accompanying the 1982 amendments at 206-07. In addition, whether a voting qualification "results" in a denial or abridgement of the right to vote may depend, at least in part, on how the newly imposed requirement changes the status quo. As the Supreme Court stated in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), "The essence of a Sec. 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Id. at 47, 106 S.Ct. at 2764.
 
 
 70
 Section 2 protects citizens in two ways. First, it prohibits the use of certain facially neutral voting qualifications that deny the vote to citizens who are disproportionately members of minority groups. See Gingles, 478 U.S. at 43, 106 S.Ct. at 2762; Butts, 779 F.2d at 148. Second, Sec. 2 protects minority groups against schemes, such as certain at-large voting systems, that dilute minority voting strength. See, e.g., Allen v. State Bd. of Elections, 393 U.S. 544, 569, 89 S.Ct. 817, 833-34, 22 L.Ed.2d 1 (1969). The Senate Report factors are especially important in assessing vote dilution claims. See Senate Report accompanying the 1982 amendments at 203-07.
 
 
 71
 Plaintiffs' amended complaints pleaded both vote denial and vote dilution theories. As to the vote denial claim, plaintiffs alleged that Sec. 5-106 interacts with racial discrimination in the New York State criminal justice system to result in denial of the right to vote on account of race. In addition, plaintiffs cited specific evidence of racially disparate treatment in sentencing, which affects enfranchisement. This pleading was sufficient to survive Rule 12(b)(6) dismissal. Whether plaintiffs are ultimately able to recover, however, will depend upon all of the circumstances, which may include the factors described in the Senate Report accompanying the 1982 amendments and other relevant considerations. Because the district court dismissed plaintiffs' claims without receiving evidence and without even a response from defendants, it could not determine whether the totality of the circumstances would reveal a Voting Rights Act violation. Cf. Hispanics for Fair and Equitable Reapportionment (H-FERA) v. Griffin, 958 F.2d 24, 25 (2d Cir.1992) (reversing and remanding sua sponte summary judgment for defendants on plaintiffs' claim under the Act but explicitly declining to state whether a trial was required).
 
 
 72
 As to the vote dilution claim, sua sponte dismissal was also inappropriate. In Gingles, the Supreme Court explained two of the bases of a vote dilution claim: "Dilution of racial minority group voting strength may be caused by dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." 478 U.S. at 46 n. 11, 106 S.Ct. at 2764 n. 11. Other practices, such as gerrymandering, instituting majority runoffs, changing elective posts to appointive and substituting at-large elections for election by single-member districts, may also result in vote dilution. Senate Report accompanying the 1982 amendments at 183.
 
 
 73
 What all of these practices have in common is that they diminish the capacity of properly registered voters to participate in the political process and to elect representatives of their choice. Plaintiffs' principal claim, however, is not that their votes have been rendered less effective by gerrymandering, run-offs, appointment of officials and the like. Rather, it is that they have no vote at all. Thus, they do not appear to have standing to raise a vote dilution claim on behalf of themselves as incarcerated felons.
 
 
 74
 Plaintiffs further contend, however, that the disproportionate effect of Sec. 5-106 dilutes the voting strength of all minorities, including those law-abiding or otherwise unincarcerated minority citizens who are registered to vote. The amended complaints stated that Sec. 5-106 results in vote dilution because "approximately 75 percent of New York State's prison population consists of persons from [14 state] assembly districts ..., which are located in New York City." A black or hispanic voter from one of these assembly districts might well have standing to assert a cause of action for vote dilution. But in the absence of such a plaintiff, the present plaintiffs apparently claim that they are appropriate class representatives of minority voters generally. However, the district court dismissed plaintiffs' claims without considering this issue. Plaintiffs should be permitted to raise it on remand.
 
 
 75
 For the reasons stated above, the decision of the district court is reversed and the case is remanded for further proceedings consistent with this opinion. If plaintiffs seek to amend their complaint, they should not be precluded from seeking to raise issues of Voting Rights Act Sec. 5 pre-clearance raised at oral argument in this court.
 
 ON PETITION FOR REHEARING
 
 76
 Defendants-appellees petition for rehearing of our decision in Baker v. Cuomo, 58 F.3d 814 (2d Cir.1995), familiarity with which is assumed. In the challenged portion of that decision, we reversed a sua sponte ruling of the district court dismissing for failure to state a cause of action plaintiffs' claims for violations of the Voting Rights Act. We held that plaintiffs, black and hispanic incarcerated felons, who are disenfranchised pursuant to N.Y.Elec.Law Sec. 5-106, had stated a cause of action under the Voting Rights Act, 42 U.S.C. Sec. 1973.
 
 
 77
 In their petition for rehearing, defendants argue that permitting plaintiffs to obtain relief under the Voting Rights Act would violate Sec. 2 of the Fourteenth Amendment, which provides that:
 
 
 78
 Representatives shall be apportioned among the several States according to their respective numbers.... But when the right to vote [in certain elections] is denied ... or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be [proportionally] reduced....
 
 
 79
 U.S. Const. Amend. XIV, Sec. 2 (emphasis supplied). Defendants claim that our opinion determined "that the Voting Rights Act may be read to require states to enfranchise prisoners," and therefore conflicts with Sec. 2 of the Fourteenth Amendment, which expressly authorizes states to disenfranchise prisoners. We do not agree that there is a conflict.
 
 
 80
 Although Sec. 2 of the Fourteenth Amendment permits states to disenfranchise felons without proportionately diminishing the state's representation in Congress, it does not permit the states to pick and choose among felons in a way that violates whatever statutory protections of the right to vote Congress has enacted pursuant to its broad powers. Or, to put it another way, Sec. 2 clearly does not authorize states to intentionally disenfranchise black felons while permitting white felons to vote, Hunter v. Underwood, 471 U.S. 222, 225, 233, 105 S.Ct. 1916, 1918-19, 1922-23, 85 L.Ed.2d 222 (1985), and Congress may enforce the constitutional provisions against such discrimination by applying the Voting Rights Act to prisoners, at least to the extent of prohibiting voting requirements that achieve discriminatory results. See, e.g., Thornburg v. Gingles, 478 U.S. 30, 35, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986); City of Rome v. United States, 446 U.S. 156, 175, 100 S.Ct. 1548, 1560-61, 64 L.Ed.2d 119 (1980).
 
 
 81
 To the extent that this limitation changes the balance of power between the federal government and the states, we believe that Congress provided a clear statement of its intention to do so as required by Gregory v. Ashcroft, 501 U.S. 452, 460-61, 111 S.Ct. 2395, 2400-01, 115 L.Ed.2d 410 (1991). See 42 U.S.C. Sec. 1973, as amended (prohibiting voting requirements that result in denial or abridgement of the right to vote on account of race).
 
 
 82
 Defendants' reliance on Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) is also misplaced. In that case, the Supreme Court struck down a provision of the Voting Rights Act that purported to require states to establish an 18-year-old voting age for local elections. The Court determined that there was no factual foundation to support the notion that a 21-year-old vote requirement discriminated on the basis of race and that Congress had made no such legislative finding. Id. at 130, 91 S.Ct. at 267. Thus, Justice Black stated, "Since Congress has attempted to invade an area preserved to the States by the Constitution without a foundation for enforcing the Civil War Amendments' ban on racial discrimination, I would hold that Congress has exceeded its powers." Id. (emphasis added). However, the Court said nothing to indicate that Congress would be similarly limited if it were acting to enforce the Civil War Amendments, as it clearly was in adopting the "results test" of 42 U.S.C. Sec. 1973.
 
 
 83
 Defendants raise several additional arguments in their petition, which were not raised in this court prior to our decision and which we do not decide in this petition for rehearing. However, because defendants have never filed a response to plaintiffs' action in the district court, they should be free on remand to move for Rule 12(b)(6) dismissal on any basis not already considered and ruled upon by this court. Contrary to defendants' contention, nothing in our opinion precluded them from so moving.
 
 
 84
 For the foregoing reasons, the petition for rehearing is denied.
 
 
 
 [1]
 The author, a Yale Law School student, argued the instant case on behalf of appellants in this court
 
 
 [2]
 As discussed above, appellant Canady never filed an amended complaint. However, under the circumstances, this should not preclude him from joining the other appellants in filing an amended complaint on remand